## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------x
                                                    :
GLOBAL LYME ALLIANCE, INC.,                         :      Case No. _____
                                                    :
                        Plaintiff,                  :
                                                    :
        -- against --                               :
                                                    :
CAMY CALVE d/b/a CAMY CALVE                          :
EVENTS,                                              :
                                                    :
                        Defendant                   :
----------------------------------------------------x
```

## COMPLAINT

Plaintiff, Global Lyme Alliance, Inc., for its complaint against Defendant Camy Calve, alleges as follows:

### THE PARTIES

1.      Plaintiff Global Lyme Alliance, Inc. (sometimes hereinafter referred to as "Plaintiff" or "GLA" or "Global Lyme") is a non-stock corporation organized under the laws of Connecticut and is an Internal Revenue Code 501(c)(3) charitable organization.  GLA is headquartered at 1290 East Main Street in Stamford, Connecticut 06902.

2.      Defendant Camy Calve is an individual doing business as a sole proprietor under the name "Camy Calve Events" (sometimes hereinafter collectively referred to as "Defendant" or "Calve" or "CCEvents") with her principal place of business at 152 W. 57th Street, New York, New York 10019.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  The amount in controversy in this action exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

4.     Plaintiff GLA is a citizen of Connecticut in that is a corporation organized under the laws of Connecticut and has its principal place of business and headquarters in Stamford, Connecticut.

5.     Defendant Calve is, upon information and belief, a citizen of the state of New York residing in New York City (Manhattan).

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.     Calve's Work with GLA

6.     GLA is the leading national 501(c)(3) organization dedicated to conquering Lyme and other tick-borne diseases through research, education and awareness.  GLA has gained national prominence for funding the most urgent and promising research in the field, while expanding education and awareness programs for the general public and physicians.  GLA-funded researchers – who were the first to prove the existence of the previously disputed chronic Lyme condition – discovered how the disease can survive antibiotic therapy, and now understand far more about what makes the Lyme bacterium different than any other type of infection.

7.     GLA offers the general public and physicians significant education and awareness initiatives, including an interactive school curriculum, a camp awareness program, and a Continuing Medical Education-accredited medical education program for healthcare professionals.  GLA's Patient Services Program helps people suffering from Lyme disease. Since fundraising is critical to GLA performing its charitable mission, GLA engages in a number of significant fundraisers, which include, without limitation, biennial large-scale galas, which

fundraisers enabled GLA to award more than $3.5 million dollars over the last 2 years to leading academic and medical institutions across the country.

8.    In January 2014, while Lyme Research Alliance, Inc. ("LRA") and Tick Borne Disease Alliance ("TBDA"), who were both predecessor companies of GLA, were coordinating efforts aimed at an eventual merger, Calve was engaged as a marketing consultant by LRA and TBDA pursuant to a written confidentiality agreement dated as of January 5, 2014 (hereinafter the "NDA"), a true and correct copy of which is attached as Exhibit 1.

9.    As is set forth more particularly in the NDA, Calve undertook numerous confidentiality obligations to LRA and TBDA to protect their confidential information, which was defined as follows:

> Confidant acknowledges being informed that as a consultant for the Company, Confidant will learn, generate, or have access to confidential or proprietary non-public business or personal information ("Confidential Information") about the Company, its members, partners, officers, employees, investors, clients, business partners or their family members (collectively, the "Protected Group").

> Confidant also acknowledges being informed and agrees that the term Confidential Information includes for purposes of this Agreement a broad range of information (whether or not in writing), documents, data and materials with which Confidant may come into contact while retained by or working with the Company, including, but not limited to, trade secrets, passwords, financial information and records, personnel compensation information, agreements between the Company and its vendors or others, marketing plans, methods of operation, medical research, and information about or received from clients and other companies with which the Company does business, including all disks, files and notes compiled in connection therewith.  Confidant also acknowledges being informed that the unauthorized use or disclosure of Confidential Information could cause great harm, loss or embarrassment to members of the Protected Group.

Exhibit 1, NDA, p. 1.

10.     As is important for present purposes, Calve undertook an absolute obligation (which would continue after the termination of Calve's consulting relationship) to preserve and protect LRA's and TBDA's confidential information (which entities merged together to form GLA in 2015) in pertinent part as follows:

> Accordingly, as a condition of Confidant's initial and continued retention by or working with the Company, Confidant and the Company agree that Confidant shall:
>
> (a)     never (even after ceasing to be retained by or working with the Company) directly or indirectly disclose any Confidential Information to any person or entity outside the Company or use Confidential Information for Confidant's personal benefit;
>
> (b)     immediately upon cessation of Confidant's relationship with the Company, return all Company property and materials of any kind, including all Confidential Information, to the Company and not access (or assist others to access) the Company's computer network, voice mail system, or other information systems; and

Exhibit 1, NDA, p. 1.

11.     Additionally, the NDA contained a clause permitting the Company (as defined therein) to obtain injunctive relief as well as to recover any legal fees that it might incur should Calve violate the terms of the NDA:

> In no way shall execution of this agreement affect Confidant's "at-will" retention with the Company.  Confidant agrees that the Company shall be entitled to injunctive relief to enforce its rights hereunder, in addition to any other relief to which it may be entitled.
>
> The Confidant shall indemnify and hold the Company harmless from any costs, expenses or claims arising from the Confidant's breach of this Agreement, including without limitation, all costs and fees (including reasonable attorney's fees) incurred by the Company in enforcing its rights hereunder.

Exhibit 1, NDA, p. 2.

12.     In February 2015, GLA engaged defendant Calve as a vendor to assist in promoting and implementing GLA's annual fundraising gala on October 8, 2015 to be held at Cipriani, 42nd Street, New York City (the "2015 GLA Gala").  Calve agreed to a contract dated February 15, 2015 identifying the services that she was being engaged to provide to GLA in connection with the 2015 GLA Gala (hereinafter the "2015 Calve Services Agreement"), a true and correct copy of which is attached as Exhibit 2.    As is reflected in the 2015 Calve Services Agreement, and as was otherwise consistent with her then existing NDA that continued to apply, Calve agreed not to share donor or prospective donor mailing lists for the 2015 GLA Gala with anyone else:

> 4.     Camy Calve and CCEvents will take responsibility for the compilation of mailing lists, including:
>
> e.     All mailing lists **become the property of GLA and will not be shared**.

Exhibit 2, 2015 Calve Services Agreement, § 4(e)(Emphasis Added).

13.     More specifically, Calve's critical role was to identify honorees and co-Chairs of the 2015 GLA Gala, find additional high net worth donors to participate in and/or attend the gala, and to contact and market the event to all potential donors that were identified by GLA board members, the honorees and co-Chairs via mail, email and phone.  Calve also collected the large donations made during the night of the 2015 GLA Gala.   Calve's responsibilities also included, without limitation, coordination with the professional entertainment and their crew for the 2015 GLA Gala, but did not include the "night of event" logistics beyond working with the entertainers.

14.     To facilitate her communications on behalf of GLA with its donor base, Calve was furnished with the following GLA email address: camy.calve@globallymealliance.org. Calve had access to all of GLA's donor base for those solicited.

15.     As described more fully *infra*, GLA also hired Calve for 2016 and 2017 and Calve had the same access to GLA's donor base in those years as she did in 2015.

16.     While Calve did not, as originally had been contemplated, succeed herself in bringing in large donors for the 2015 GLA Gala, at least without them first being identified and/or approached by GLA staff, board members or volunteers, she did work with honorees and co-Chairs to make solicitations and also helped with entertainment.   GLA decided to re-hire Calve for the same responsibilities for GLA's 2016 New York City gala (to be held on October 13, 2016) (the "2016 GLA Gala"), but Calve made it clear to GLA that she would only accept the assignment if she also controlled the "night of event" logistics, and to that end, Calve specified as part of her contract demand that GLA could not retain the same vendor for that function that had previously very effectively ran the "night of event" logistics for the 2015 GLA Gala.

17.     After Calve repeatedly assured GLA that she and her staff could successfully handle the tremendous amount of gala night logistics, and primarily because of the key relationships she had established with GLA's donor base in connection with the 2015 GLA Gala, GLA agreed to Calve's requirements and proceeded to engage her to run the 2016 GLA Gala.

18.     As Calve had also done in connection with the 2015 GLA Gala, Calve also signed a written agreement dated February 10, 2016 identifying the services that she was being engaged to provide to GLA in connection with the 2016 GLA Gala (hereinafter the "2016 Calve Services Agreement"), a true and correct copy of which agreement is attached as Exhibit 3.  Section 4(e)

of the 2016 Calve Services Agreement contained the same confidentiality and non-sharing provision as the 2015 Calve Services Agreement.  (*See* Exhibit 3, 2016 Calve Services Agreement, § 4(e)).

19.     As had been the case with the 2015 GLA Gala, where Calve held periodic telephonic meetings with the GLA New York City gala committee to create a list of potential honorees and co-Chairs, none of the 2016 GLA honorees and event co-Chairs were identified nor secured by Calve, but rather by GLA Board members and its management team.   Calve again did, however, perform effectively with regards to contacting and soliciting those donors and prospective donors for the 2016 GLA Gala, aided by the fact that in terms of directing her solicitations Calve worked off of a master donor list she assembled from names and contact information that GLA's staff and board members furnished to her.   Along the same lines, once the honorees, co-Chairs and donors were identified by others, Calve was very effective at soliciting donations from them for GLA.

20.     GLA's 2016 Gala did not run smoothly, however, as Calve had promised. Approximately 6 weeks before the gala, GLA became concerned about Calve's ability to properly effectuate the gala logistics, and GLA was forced to contact their previous, above described logistics vendor to help supplement and help Calve's team.  Despite the fact that Calve and her own team were floundering in terms of the logistics, Calve threatened to resign if GLA signed this vendor to assist her team.   With such a short time before the 2016 GLA Gala, with fundraising for the gala running behind schedule, and with Calve having all of the GLA donor list contact information, GLA had no choice but to acquiesce to Calve's demands and GLA ceased trying to bring its former logistics vendor back to help.

21.     Unfortunately, Calve did not prove to have the logistics expertise nor the trained staff to effectively run all the logistics for the 2016 GLA Gala and they made critical mistakes during the night of the event.  Nonetheless, Calve did do a nice job in collecting donations for GLA (as she had done before in 2015) and GLA decided to re-engage her for GLA's October 11, 2017 New York City Gala at Cipriani (the "2017 GLA Gala").  This time, however, GLA insisted that Calve would not handle the event logistics (and she would instead solely focus on fundraising from GLA's donor lists), but in order to treat Calve nicely and allow her to save face, GLA still offered to pay her the same fee for the 2017 GLA Gala as she had been paid for the 2016 GLA Gala despite the fact that Calve would have no logistics responsibility, which again would instead be handled by a new outside vendor.

22.     Once again as she had done with the 2015 and 2016 GLA Galas, Calve signed a written agreement identifying the services that she was being engaged to provide to GLA in connection with the 2017 GLA Gala (hereinafter the "2017 Calve Services Agreement"), a true and correct copy of which agreement is attached as Exhibit 4, and which contained two (2) express provisions confirming that GLA's donor solicitation lists, records, and related information (the primary fundraising tool used by Calve) would be made fully available to Calve, and that this GLA furnished information (as well as any lists that Calve herself might generate during the engagement) were GLA property and would not be shared by Calve with others:

> 3.     Camy Calve and CCEvents will take responsibility for the compilation of mailing lists, including:
>
>> a.     Camy Calve **will request and secure mailing lists from Honorees and Co-Chairs**;
>>
>> b.     Developing **additional corporate lists as related to the Honorees and Co-Chairs**;

c.     CCEvents **will request and secure all GLA donor lists from GLA, including individual board member lists;**

d.     CCEvents staff will be responsible for additional research on contact information (phone numbers, email addresses) where necessary and available.

e.     All mailing lists **become the property of GLA and will not be shared**.

f.     It is agreed that GLA and CCEvents will operate off of a shared drive, that can be accessed 24/7 by either party.

Exhibit 4, 2017 Calve Services Agreement, § 3(a)-(f) (Emphasis added).

6.     CCEvents will be responsible for receipt and recording of all monies received from solicitation mailings, including donations, ticket and table sales and recording of all monies.  Bookkeeping reports will be forwarded on a weekly basis in an agreed upon format along with all checks received.   CCEvents will provide weekly updated reports on responses to all solicitations.  Immediately prior to the event, the timing of reports is anticipated to be intensified.   **As with mailing lists, all donor records become the sole property of GLA and shall not be shared**.

Exhibit 4, 2017 Calve Services Agreement, § 6 (Emphasis added).

23.     In 2017, once again, Calve did not find any new donors for GLA on her own, but Calve still did an effective job of working with GLA's honorees and co-Chairs to create and follow-up with their donor lists.  Calve also contacted everyone on GLA's donor lists, collected funds, tracked them and was privy to all key decisions GLA made concerning the 2017 GLA Gala, as well as the identities of potential honorees and co-chairs under consideration by GLA for GLA's upcoming October 2018 New York City gala (the "2018 GLA Gala").

24.     After three (3) years of working with GLA, Calve developed knowledge of how to most effectively execute a Lyme-focused gala and raise money for it, again using the donor

list and donor specific information furnished to her by GLA, and the issues to highlight surrounding Lyme disease that would appeal to these particular donors in terms of soliciting their participation to support GLA.  The 2017 GLA Gala was an overall success, with GLA raising in excess of $2 million dollars.

25.     While doing its advance planning in early 2018 for the upcoming 2018 GLA Gala, GLA decided not to engage Calve for it, *inter alia*, because GLA, for various reasons, wanted to go in another direction in terms of the methodology of donor identification and solicitation.  Calve was informed of GLA's decision in early 2018, but was told at the time that GLA would consider using her services in the future on other GLA fundraising events.

**B.     The Formation of GLA**

26.     In mid-February 2015, TBDA, a non-profit organization merged with and into LRA (previously called "Time for Lyme"), with LRA being the surviving entity of such merger. Simultaneous with the merger, LRA changed its name to Global Lyme Alliance, Inc. (GLA).  As a result of the merger, TBDA ceased to exist and any rights to use its name or other intellectual property became the exclusive property of GLA.

27.     The TBDA Board was supportive of merging with LRA, *inter alia,* because TBDA was focused on Lyme disease awareness and LRA was focused on Lyme disease research, and both groups agreed that it did not make sense and would be extremely dilutive (as well as creating confusion) for multiple Lyme groups to be soliciting the same donor base in the New York tristate area.  Merger negotiations started at the end of 2013, were voted on and approved by both boards in May 2014, and the merger was consummated after regulatory approval in the spring of 2015.  During the pre-merger period, while funds could not be co-mingled, the TBDA and LRA boards agreed to work together until the merger was consummated to set up the infrastructure, policies, and the organization of the merged GLA.  Once the merger

was concluded, by design every GLA Board committee consisted of approximately the same number of LRA and TBDA members.

**C.    Calve Joins Forces with GLA's Competitors and Misappropriates GLA's Donor Information**

28.    In late 2017 or early 2018, and upon information and belief, five (5) former GLA Board members joined Project Lyme (based in Maine), either as Board members (including one of them being named the Executive Committee Chair of Project Lyme, and another one of them being named Co-Chair of Project Lyme), or as senior management for Project Lyme.  In addition to each being party to a non-disclosure agreement with GLA, all of these former GLA Board members who are now believed to have joined Project Lyme still have limited ongoing fiduciary obligations that they owe to GLA, including, without limitation, a prohibition against using any information they may have learned in connection with their TBDA and/or GLA directorships to the detriment or injury of GLA, as well as obligations under applicable law not to tortiously interfere with GLA's organization building and fund-raising efforts nor to engage in acts of defamation or disparagement in relation to GLA.

29.    Since his forced resignation from GLA in late August 2015, one of these former Board members now associated with Project Lyme has, upon information and belief, out of personal spite, misused GLA's confidential information, promised to harm GLA, and subsequently has continuously done so.  He has also encouraged other former GLA board members aligned with him to leave GLA and to misuse GLA information to which they were privy.

30.    Yet another former GLA board member currently at Project Lyme who expressed a strong animus toward GLA during her tenure with GLA and sought to harm GLA out of personal spite, along with the aforementioned former GLA board member (referenced in

paragraph 29 above), established unauthorized close relationships with a competitor to GLA on the West Coast, Bay Area Lyme Foundation, while they were still GLA board members. Those former GLA board members are now apparently acting in concert and have recruited the Bay Area Lyme Foundation to co-sponsor (along with Project Lyme) a gala on November 5, 2018 at the Ziegfeld Ballroom in New York City (hereinafter the "Project Lyme/Bay Area 2018 NYC Gala").

31.     Upon information and belief, the Project Lyme/Bay Area 2018 NYC Gala is specifically intended to harm GLA, in that it is a competing New York City Lyme fundraising gala that is being scheduled to be held a mere three (3) weeks after the 2018 GLA Gala.

32.     In furtherance of this effort and other efforts to harm GLA, and upon information and belief, certain of these former disaffected GLA Board members, who knew Calve well from their time with GLA and were well aware that Calve had broad access to very sensitive and highly confidential and proprietary information concerning all of GLA's donors and honoree, targets pushed to hire Calve for this very reason.

33.     Calve, despite her knowledge that certain of these former GLA Board members have a vendetta against GLA, voluntarily agreed to go to work for them at Project Lyme. Upon information and belief, Calve is using and continues to use (at the behest of the above referenced former GLA Board members now associated with Project Lyme) GLA's most highly confidential and proprietary, current and potential donor and honoree information for the benefit of Project Lyme, as well as to specifically to cause harm to GLA by attempting to undercut, sabotage and divert key donors from GLA's 2018 NYC Gala, and her actions are causing irreparable harm to GLA.

34.     Thus, the same subgroup of ex-TBDA board members and ex-GLA board members, which members in 2014 and 2015 agreed that there should not be two (2) Lyme organizations soliciting the same donors in the New York Tristate area, are now undertaking efforts to create that same problem again.  While these two (2) entities (*i.e.*, Project Lyme and the Bay Area Lyme Foundation) are, of course, legally privileged to fairly compete against GLA in the New York tristate area despite the fact that it will be counter-productive to Lyme disease prevention, they are not permitted to do so using GLA's confidential information that Calve obtained or otherwise has now misappropriated from GLA.

35.     GLA has learned or otherwise has reason to believe that Calve and some of the former GLA Board members were approaching key donors and players in GLA's previous NYC galas (which donor information they obtained, upon information and belief, either from Calve or in confidence during their respective tenures at TBDA and/or GLA, as applicable) in an effort to recruit them to plan and/or be part of the Project Lyme/Bay Area 2018 NYC Gala that would directly compete with the 2018 GLA Gala.

36.     This news was of significant concern to GLA in that the placement of another Lyme disease fundraising gala in New York City in early November 2018 is likely to cause considerable confusion in the greater New York area Lyme community, compounded by the fact that Project Lyme (headquartered out of Maine) and Bay Area Lyme Foundation (headquartered in California) seem to be targeting key GLA donors and past-year GLA gala attendees, upon information and belief, using GLA's donor information secured through Calve in breach of her confidentiality obligations to GLA.

37.     Upon information and belief, certain former GLA Board members have joined forces with Project Lyme and Bay Area Lyme Foundation, including to drive forward their

planned 2018 New York City gala, in furtherance of certain of those former GLA Board members' long-held animosity and malice toward GLA and its present board.

38.    Upon information and belief, Project Lyme and Bay Area Lyme Foundation engaged Calve d/b/a Camy Calve Events as their event coordinator for the Project Lyme/Bay Area 2018 NYC Gala for the primary reason of seeking to secure use of Calve's knowledge of GLA's donors and prospective donors (including for the 2018 GLA Gala) so that they could improperly use Calve's inside information to solicit those donors for their own competing gala.

39.    This is a matter of grave concern to GLA, *inter alia*, due to the fact that Calve is directly working with former GLA Board members with a well-known animus and vendetta against GLA and for relatively newly organized entities with no direct geographical nexus to the greater New York area (Project Lyme operating out of Maine and Bay Area Lyme Foundation operating out of California) and with no known track record of successfully raising funds for Lyme disease over any extended period, either in the greater New York area or otherwise.

40.    More importantly, upon information and belief, neither Project Lyme nor Bay Area Foundation have any known established Lyme community donor base of any magnitude within the greater New York area and their engagement of Calve, who never had any material success independently soliciting new donors for GLA and instead for a 3 year period was almost wholly dependent on using donor lists prepared by GLA, GLA's Board or GLA's donors, seemed calculated to enable them to access the confidential GLA donor information and lists that Calve was entrusted with by GLA, and which GLA donor information (including donor prospects) Calve was contractually and otherwise bound under applicable law to use solely for the benefit of GLA and not to share or use for the benefit of GLA's competitors, no less competitors (directed and controlled by certain disaffected and malcontent former GLA Board

14

members*)* who might wish to cause harm to GLA for the mere sake of causing harm based on grudges relating to them having been forced to resign in 2015 from GLA.

41.     Calve has access to all of GLA's potential honorees, co-Chairs and donors and can do the most harm to GLA.  Upon information and belief, Calve and her new team already have secretly solicited GLA's top donors, top honoree targets, and Gala event personalities to secure them for Project Lyme/Bay Area Foundation to the detriment of GLA.   Indeed, GLA's concerns are not mere unfounded speculation or paranoia, as other significant GLA donors have reported that they are receiving "save the date" mailing solicitations from Calve for the November 2018 Project Lyme/Bay Area NYC Gala.

42.     Upon information and belief, most, if not all, of the persons and entities who will receive solicitations from or through Calve to attend the Project Lyme/Bay Area 2018 New York City Gala are persons who became known to Calve, and with whom she developed relationships, solely through her engagement as a GLA vendor.   Calve has no right to misappropriate this highly proprietary and carefully cultivated GLA donor information for the use of GLA's competitors to run their own directly competitive gala.

43.     Moreover, to the extent that any of five (5) former GLA directors who are now seemingly behind either Project Lyme or the Bay Area Lyme Foundation (or both) claim that they were the source of these entities obtaining this GLA donor information, this information was learned by them while they were GLA directors and they are similarly prohibited (both by an ongoing limited fiduciary duty and pursuant to their respective NDA's) from providing this information for the use of GLA's competitors.

44.     GLA is run as a professional organization with strict spending controls, due diligence done on major projects and a science staff and advisory board that make GLA highly

reputable.  GLA helps patients.  GLA does not desire to do harm to Calve, but Calve must not

be allowed to share confidential donor information with GLA's competitors, many of which have

vindictive and ego driven agendas, or Lyme disease patients will suffer.  Further, if the 2018

GLA Gala is not successful, GLA will not be able to afford the programs it needs, as the New

York City gala is GLA's primary fundraiser.

45.     Calve and the former GLA Board members she is now working with at Project

Lyme all know this full well, which sadly is, upon information and belief, exactly why they are

pushing a competitive New York City gala.  Indeed, these former GLA board members are more

interested in causing harm to GLA for the sake of causing harm to GLA, than actually achieving

a successful gala in New York City for Project Lyme.  Upon information and belief, Calve is

also sore at GLA because GLA did not hire her for 2018 and she now seeks to harm GLA, as

well as to cause the GLA leadership to divert its focus from raising the funds needed for

identified critical research to legal defense efforts.

46.     By virtue of all the foregoing, GLA has been damaged and is faced with imminent

and substantial irreparable harm if Calve continues to misappropriate its donor information in

flagrant breach, *inter alia*, of her confidentiality obligations under the NDA and the 2015, 2016

and 2017 Calve Services Agreements.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract against Defendant Calve: Breach
### Of NDA and the Calve Services Agreements")

47.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1

through 46 as if fully set forth herein.

48.     Pursuant to the express terms of the NDA and the 2015, 2016 and 2017 Calve

Services Agreements described herein, Defendant Calve was only allowed to use GLA's donor

solicitation lists, records, and related information, which is all GLA property, to get donations for GLA at their galas and Calve was not allowed to share the information with anyone else or otherwise use it for any purpose other than the work Calve was contracted to perform for GLA.

49.     Defendant clearly understood, agreed and covenanted that all donor solicitation lists, records, and related information is GLA's sole property and thus breached these contracts.

50.     Upon information and belief, Calve has utilized, and is continuing to utilize, the above referenced highly confidential and proprietary information that she obtained in confidence from GLA for the direct benefit of a competitor of GLA in flagrant breach of the above referenced contractual obligations that Calve owes to GLA.

51.     By virtue of all the foregoing, GLA has been damaged in an amount to be proven at trial.

52.     Additionally, GLA seeks an award of its reasonable attorney's fees, disbursements and costs of prosecuting this Action against Calve as is expressly authorized by the NDA.

53.     Due to the malicious and outrageous nature of Calve's above described conduct and breaches of contract, GLA demands punitive damages be awarded in an amount to be proven at trial.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Injunction against Defendant)

54.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 52 as if fully set forth herein.

55.     Calve's above referenced breaches of her express contractual obligations (both under the NDA and 2015, 2016 and 2017 Calve Services Agreements) to strictly maintain the confidentiality of GLA's confidential and proprietary information that she was entrusted with

and which she was only authorized to use for the sole purpose of performing her contractual obligations to GLA have exposed GLA to irreparable harm, for which there is no certain remedy at law.

56.     As such, GLA prays for the Court to issue such injunctive relief as it deems just, equitable and proper restraining Calve and any persons working in active concert with her from using or continuing to use any information or documents that Calve may have obtained in confidence from GLA or otherwise purloined from GLA in furtherance of any activities for Project Lyme or the Bay Area Lyme Foundation including, without limitation, their proposed November 2018 Lyme disease fund raising gala in New York City.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (Conversion against Defendant)

57.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56 as if fully set forth herein.

58.     As previously described, Calve was entrusted with and remains in possession of highly confidential and proprietary GLA donor and past gala related information that she has an absolute duty to hold in strict confidence and not to use for any purpose whatsoever except to the extent specifically authorized by GLA and solely to facilitate GLA's lawful purposes and objectives.

59.     Upon information and belief, Calve has converted GLA's above described confidential and proprietary information for her own individual use and benefit, as well as for the use and benefit of Project Lyme and the Bay Area Lyme Foundation, with the knowledge that her use of same is inimical and highly damaging to GLA's interests.

60.     By virtue of all the foregoing, Calve has converted GLA's confidential and proprietary business information for her own advantage and GLA demands an award of

compensatory damages in an amount to be proven at trial, as well as punitive damages due to the malicious and outrageous nature of Calve's conduct.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### (Unjust Enrichment against Defendant)

61.　Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 60 as if fully set forth herein.

62.　Calve has wrongfully used GLA's donor information to work with and obtain compensation from GLA's competitors.　Upon information and belief, Calve would not have been able to so enrich herself without wrongfully using GLA's donor information.

63.　Calve's wrongful use of GLA's donor information has come at GLA's expense, because those donors that Calve solicits on behalf of GLA's competitors will be less likely to attend the 2018 GLA NYC Gala and/or to donate to GLA.

64.　By virtue of all the foregoing, Calve has been unjustly enriched at GLA's expense and GLA demands an award of compensatory damages in an amount to be proven at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
#### (Tortious Interference against Defendant)

65.　Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 as if fully set forth herein.

66.　Upon information and belief, Calve has wrongfully used GLA's donor information to contact donors and solicit donations from GLA's competitors.　GLA has ongoing business relationships with the donors and prospective donors contained in the donor information that Calve misappropriated.

67.     In the course Calve's communications with GLA's donors, upon information and belief, Calve has intentionally interfered with GLA's relationships with its donors by attempting to persuade those donors to donate to GLA's competitors and not GLA.

68.     As described herein, upon information and belief, Calve's motivations for interfering with GLA's donor relationships are based upon the ill will she, and the competitors she now works for, feels for GLA.

69.     Calve's wrongful use of GLA's donor information has interfered with GLA's donor relationships, *inter alia*, because it creates confusion with GLA's donor base who will be targeted and solicited by Calve and who may thus be less likely to attend the 2018 GLA NYC Gala and/or to donate to GLA.

70.     By virtue of all the foregoing, Calve has tortiously interfered with GLA's donor relationships and expectancies and GLA demands an award of compensatory damages in an amount to be proven at trial, as well as punitive damages due to the malicious and outrageous nature of Calve's conduct.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Constructive Trust)

71.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 70 as if fully set forth herein.

72.     As described herein, Calve was required to hold GLA's donor information in confidence and promised to do so multiple times.

73.     GLA provided its donor information to Calve in reliance on Calve's promises to hold that information in confidence, and would not have done so absent such promises.

74.     As describe herein, Calve has been unjustly enriched by here wrongful use of the donor information that GLA provided to her.

75.     By virtue of all the foregoing, equity requires that a constructive trust be imposed upon GLA's donor information in Calve's possession, and that Calve must return that property to GLA.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Replevin against Defendant)**

76.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 75 as if fully set forth herein.

77.     Plaintiff brings the cause of action of replevin against Defendant because Defendant signed the 2015, 2016 and 2017 Calve Services Agreements that explicitly stated that the donor solicitation lists, records, and like information is the sole property of GLA and Defendant along with Project Lyme is using such information to recruit donors for Project Lyme's own Lyme gala that would compete with that of GLA's and causes considerable harm and confusion in the greater New York area Lyme community.

78.     The donors that are being contacted by the Defendant are people that became known to Defendant solely through her engagement as a GLA vendor and the use of such information harms GLA's ability to afford programs that it needs as its primary fundraisers to ensure that GLA can continue to help patients that are affected by Lyme disease.

79.     The highly confidential and proprietary information that Calve has converted and is, upon information and belief, presently misusing for the benefit of GLA's competitors and to the detriment of GLA is unique and special property which should and must be returned to GLA.

80.     By virtue of all the foregoing, GLA seeks a judgment of replevin permitting GLA to regain possession of any GLA documents or GLA computer files taken by Calve or that might otherwise still be in the possession, custody or control of Calve (or any persons working in active concert with her including, without limitation, Project Lyme and the Bay Area Foundation).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the entry of judgment in its favor against Defendant as follows:

1. Compensatory damages in an amount to be proven at trial.

2. Punitive damages in an amount to be proven at trial.

3. Preliminary and permanent injunctive relief.

4. An award of replevin concerning any of the Plaintiffs' property or information that is in Defendant's possession, custody or control.

5. Such attorneys' fees, costs, disbursements as Plaintiff might be entitled to under applicable law.

6. Attorneys, fees costs and disbursements incurred by Plaintiff in connection with the prosecution of this action as is expressly authorized under the NDA.

7. Such other, further and different relief as the Court deems just, equitable and proper.

Dated:  August 21, 2018

THE PLAINTIFF
GLOBAL LYME ALLIANCE, INC.

By: _____

James Nealon
Joseph Gallo
WITHERS BERGMAN LLP
430 Park Avenue
New York, New York 10022
Phone:  (212) 848-9800
Fax:  (212) 848-9888
James.nealon@withersworldwide.com
Joseph.gallo@withersworldwide.com